**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ) | | |
| Plaintiff, ) | Case Number: 07 CR 851 | |
| ) | | |
| v. ) | Judge: Robert W. Gettleman | |
| ) | | |
| FRANCISCO MENDEZ JR. ) | | |
| Defendant. ) | | |

**FRANCISCO MENDEZ JR'S MOTION TO SUPRESS TITLE III MATERIAL AND MEMORANDUM IN SUPPORT THEREOF**

NOW COMES, Francisco Mendez Jr., by and through his attorney, Gal Pissetzky, and pursuant to 18 U.S.C. §2518(10)(a) hereby moves this Honorable Court to suppress all evidence obtained through the improper Title III wiretap. Evidentiary hearing is requested. In support thereof he states as follows:

**I.     BACKGROUND**

   **A.     Procedural History**

On March 18, 2008 the Special February 2008-1 Grand Jury handed down a nine count indictment and forfeiture allegations against: Francisco Mendez-Nunez a/k/a "Pancholine" or "Pancho", Salvador Garcia a/k/a "Chava", Francisco Mendez Jr. a/k/a "Paco", Javier Garcia a/k/a "Javi", Francisco Soto, Juan Duran a/k/a "Juanillo", Oscar Andrade, Victor Velazquez and Don McNish. *See* March 18, 2008 indictment. Count One of the indictment charged the aforementioned nine individuals with, beginning no later than in or about 2005 and continuing to on or about December 20, 2007, conspiracy to distribute a controlled substance, namely five kilograms or more of mixtures containing a detectible amount of cocaine. *Id*. Court Nine of the indictment alleges that Francisco Mendez-Nunez and Juan Duran used a telephone in commission of a felony, as charged in Count One of the indictment. *Id*. Count One is the only

count in the indictment that alleges Francisco Mendez Jr. engaged in any wrongdoing. Mr. Mendez Jr. has entered a plea of Not Guilty.

### B. History of Title III Wiretaps in this Case.

The government first applied for a Title III wiretap regarding this matter on phone number (773) 390-6007; "Target Phone 2". (Bates stamp TIII_TP2_001-00069). Francisco Mendez Jr. was not named in that application. The Honorable Judge James F. Holderman granted the wiretap request on August 13, 2007. (Bates stamp TIII_TP2_001-00077). A follow up application to extend the wiretap on that same phone number was granted on September 11, 2007. (Bates stamp TIII_TP2_001-00379). This follow-up application again did not name Francisco Mendez Jr. as a target.

After having already accumulated a wealth of information, the government unnecessarily applied for and was granted a Title III wiretap on phone number (773) 315-0030; "Target Phone 3". (Bates stamp TIII_TP3_001-00103). Again, Francisco Mendez Jr. was not named in the application. However, this application was granted on October 9, 2007. (Bates stamp TIII_TP3_001-00182). The government then applied for an extension on Target Phone 3. (TIII_TP3_001-00378). This application was the first instance of Francisco Mendez Jr. being named as an intended interceptee or violator. The extension was granted on November 8, 2007. (Bates stamp TIII_TP3_001-00449).

## II. LEGAL ANALYSIS
### A. Prayer for Relief

Francisco Mendez Jr. moves to suppress all wire tap evidence because: (1) the wiretap applications were insufficient to establish Necessity, and (2) the government failed to use the minimization procedures ordered by the Honorable Judge Holderman.

### B. Standing to Challenge the Title III Wiretaps

The statutory language of Title III allows "aggrieved persons" to move to suppress the contents of any intercepted wire or oral communication, and evidence derived from those wiretaps, on the grounds that (1) the communication was unlawfully intercepted; (2) the Order of authorization for approval was insufficient on its face; or (3) the interception was not made in conformity with the Order of Authorization. *See* 18 U.S.C. § 2518(10). The term "aggrieved persons" is defined as a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed. *See Alderman v. U.S.*, 394 U.S. 165, 171-180 (1969), 18 U.S.C. § 2518.

Francisco Mendez Jr. fits the definition of an "aggrieved person" under 18 U.S.C. § 2518, because he was a party to an intercepted communication and was named as an interceptee on the application for continued interception of Target Phone 3. As an aggrieved person, Mr. Francisco Mendez Jr. moves this Honorable Court to suppress the intercepted communication and evidence derived there from.

### C.     Standard of Review

A wiretap authorization order is presumed proper and the defendant has the burden of overcoming that presumption. *United States v. Mondragon*, 52 F.3d 291, 292 (10th Cir. 1995). To successfully challenge a judicially authorized wiretap, the defendant must come forward with a prima facie showing that the order was illegal. *United States v. Bennett*, 825 F. Supp. 1512, 1518 (D. Colo. 1993). If a wire tap is to be legal under this section, all the statutory requirements that directly and substantially implement the congressional intent to limit the use of intercept procedures must be met. *United States v. Giordano*, 416 U.S. 505, 527, (1974). The government has the burden of producing the evidence to prove the wiretap is necessary. *Mondragon*, 52 F.3d at 292.

### D.     Argument in Law

An application under 18 U.S.C. § 2518 requires the applicant to state:

> (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

> (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including
> (i) details as to the particular offense that has been, is being, or is about to be committed,
> (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted,
> (iii) a particular description of the type of communications sought to be intercepted,
> (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;
> (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;
> (d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;
> (e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application. 18 U.S.C. § 2518 (1)(a-e).

Congress set forth such strict requirements because "[T]itle III intercepts are an intrusive investigative tool." *United States v. Hanhardt*, 157 F.Supp.2d 978, 996 (N.D. Ill. 2001). The necessity requirement is a central provision of Title III. *Girodano*, 416 U.S. at 527. The "necessity requirement" exists to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 142, 153 n. 12 (1974) (citing Rep.No.1097, 10th Cong., 2d Sess., 191, U.S. Code Cong. & Admin. News 1968, p. 2112). In a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception and not the rule. *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir. 1987).

Consequently, the Supreme Court has stated that "Congress intended to require suppression where there is a failure to satisfy any of [the] statutory requirements of Title III." *Girodano*, 416 U.S. at 527. The Congressional intent was to limit the interception of private citizens' private conversations to "those situations clearly calling for the employment of this extraordinary investigative device." *Id.* To insure that the spirit of the Fourth Amendment is not violated, the Government is charged with "ma[king] a reasonable, good faith effort to run the gamut of normal investigative procedures" before wiretapping telephones. *See United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989). The judiciary is charged with the great responsibility of insuring that "utmost scrutiny [is] exercised to determine whether wiretap orders confirm to Title III." *Girodano*, 416 U.S. at 589.

As it applies to this case, the most crucial words in the Fourth Amendment are: "no Warrants shall issue, but upon probable cause." *U.S. Const. Amend. IV*. Wiretaps were brought under the reach of the Fourth Amendment with the Supreme Court's decision in *Berger v. New York*, 338 U.S. 41 (1967). In recognizing that the Fourth Amendment applies to wiretaps, congress included the probable cause requirement in 18 U.S.C. §2518. The clear and unequivocal requirements of the wiretapping provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §2510 *et seq.*, and their legislative history reveal a congressional effort to prevent law enforcement agents from proceeding by way of general search warrants. Congress has stated that "each of these [statutory] requirements reflects the constitutional command of particularization." S. Rep. No. 1097, 90th Cong., 2d Sess., 101.

Although Mr. Mendez Jr. is aware that wiretapping does not have to be the last investigative alternative, it also should not be the first. *See generally Kahn*, 415 U.S. at 153 n.12. Normal investigative procedures must be tried first. Congress articulated what kinds of behaviors constitution "normal" procedures when it stated:

> "Normal investigative procedures would include, for example, standard visual or aerial surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants." S.Rep.No. 1097, 90th Cong., 2d Sess., 1968 U.S. Code Cong. & Admin. News, p. 2190.

Generalizations, unsupported conclusions and boilerplate recitations, like the ones found in the applications in this case, do not satisfy the necessity requirement; which is the statutory

safeguard against unwarranted government invasions of privacy. *See e.g. United States v. Oriakhi,* 57 F.3d 1290, 1298 (4th Cir. 1995) (holding government cannot rely on "boilerplate recitation of the difficulties of gathering evidence," but instead must put forth "real facts and must specifically describe how, in the case at hand, it has encountered difficulties in penetrating the criminal enterprise."); *Ashley*, 876 F.2d at 1072 (bare conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience, do not comply with the requirements of [18 U.S.C.] §2518(1)(c)); *United States v. Vento*, 533 F.2d 838, 849 (3rd Cir. 1976) (holding that use of boilerplate language and absence of specifics would not be permitted, because wiretapping was meant to be last resort); *United States v. DiMuro*, 540 F.2d 503, 510 (1st Cir. 1976) (holding that agent's conclusory statements that normal investigative techniques would not work, were insufficient); *Kalustian*, 529 F.3d at 590 (holding affidavit failed to satisfy necessity requirement because it did not state why this case "presented any investigative problems which were distinguishable in nature or degree from any other" case); *United States v. Lilla*, 699 F.2d 99, 104 (2nd Cir. 1983) (rejecting general and conclusory statements that other investigative techniques would be unsuccessful).

Francisco Mendez Jr. challenges all wiretaps issued in this investigation on the grounds that the government completely and totally failed to make the statutorily required showing of necessity in any of the application for judicial authority to implement wiretaps.

### III. ARGUMENT IN FACT

#### A. The October 9, 2007 Wiretap Application Failed to Establish Necessity

On October 9, 2007 a wiretap was authorized for Target Phone 3, number 773-315-0030. The phone was registered to a Francisco Mendez-Nunez, a.k.a. "Pancholine." (Bates stamp TIII_TP3_001-00377). The application for this intercept was made under a rare circumstance; the government had already eschewed normal investigative techniques, but had the luxury of previous telephonic intercepts on Target Phone 2.

The intercept on Target Phone 2 was overly intrusive and likely illegal[1]. According to agent Holbrook, the intercept yielded an alarmingly low success rate regarding the interception of pertinent calls. As of October 8, 2008 a mere 17.45% of the calls intercepted from Target Phone 2 were deemed pertinent to the investigation.[2] (Bates Stamp 194). Although Agent Holbrook details in his affidavit how he believes them to be pertinent to the investigation, they come at an extreme cost; the overt violation of the privacy of those who were intercepted. Furthermore, the statistics clearly show that interception of pertinent calls was a rarity on Target Phone 2, while the unnecessary invasion of privacy was omnipresent.

Despite this minimal success rate, the government decided to apply for another wiretap on a different phone. As demonstrated below, there was no true necessity for the government to obtain a Title III intercept on Target Phone 3.

### A. "Normal" Investigative Techniques Were Either Never Fully Utilized Or Completely Ignored By The Government

In this case, the government eschewed several proven, reliable and effective investigation techniques. Instead, the government has relied upon the very intrusive technique of electronic eavesdropping when it was completely and totally unnecessary.

At the time the government applied for the first wiretap application, they had used several "normal" investigative techniques with great success. Instead of doing the hard work to follow through on these techniques, the investigating agents became lazy, asking for the intrusive, but easier investigative technique of wiretapping. The government then repeated this behavior in their application for a wiretap on Target Phone 3.

The affidavit in support of application for order authorizing interception of wire communications was completed by Drug Enforcement Administration (DEA) Special Agent Matthew W. Holbrook. (Bates stamp 181-233)  In this application Agent Holbrook makes a litany of conclusory and un-substantiated assertions, boilerplate generalizations and statements lacking any details related to this case or the present investigation. The application is not case specific and does not address the unique circumstances of this investigation. It is merely one

---

[1] Because Mr. Mendez Jr. does not have standing to suppress Target Phone 2, this motion will not address the shortcomings of that application.
[2] The wiretap had intercepted 3265 calls, a mere 570 of which were deemed pertinent.

baseless assertion after the next, all in an attempt to ease investigation by acquiring a wiretap. The affidavit ignores the success obtained through normal investigative techniques and does not amount to a demonstration of necessity. Specifically, the DEA had success using Confidential Sources as well as physical surveillance as detailed more clearly below. They had success with a trash pull conducted at the Mendez-Nunez residence, where the recovered evidence was indicated positive for cocaine exposure by a drug sniffing dog. (Bates stamp TIII_TP3_001-00162, 163). The DEA admits this is confirmatory evidence of Mendez-Nunez's involvement in narcotics trafficking. (Bates stamp TIII_TP3_001-00163).

Furthermore, in the application for the continuation of the wiretap on Target Phone 3, the DEA states that the pole cameras have been successful. (Bates stamp TIII_TP3_001-00431). They revealed that Mendez Nunez and his associates met and conducted business in the alley; while the cameras remained undetected. (Bates stamp TIII_TP3_001-00431). In the next breath, however, the DEA contradicts itself when it states that a wiretap will reveal the purpose of the meeting and full scope of the conspiracy. (Bates stamp TIII_TP3_001-00431). This statement is completely counterintuitive. The way to learn what was actually said at the meeting would be to establish audio surveillance at the actual meeting, or perhaps utilize the informers during the meetings. This is not something a Title III wiretap could provide. Additionally, this is the first instance where the DEA actually used the cameras and was successful in acquiring information. Had the DEA taken the steps to use this technique earlier, they would have had success without the unnecessarily intrusive wiretapping. As more fully explained below, the allegations of necessity are either insufficient or untrue as the DEA had success gathering information through traditional techniques, or does not articulate solid reasoning why traditional techniques would not work.

> **B.     Contrary to the Statements in the Affidavit, the DEA Had Success Gathering Information Through "Normal" Means Such As Cooperators and Confidential Sources.**

In the initial application for the wiretap on Target Phone 3, Agent Holbrook fully incorporated his statements provided in the 8-13-07 affidavit and 9-11-07 affidavit. (Bates stamp TIII_TP3_001-00134). The initial application of 8-13-07 details the success the DEA had in using cooperators, contradicting the later claims that the use of cooperators would be ineffective.

- 8 -

CS-1 was able to infiltrate deep into the organization and meet individuals at the top and CS-2 was an excellent example of the DEA being able to "flip" arrestees into cooperators.

CS-1 was able to meet individuals allegedly involved in the conspiracy in bars and befriend them. (Bates stamp TIII_TP2_001-00034). He was further able to identify that "Chava" ("Chava" is the nickname given to co-defendant Salvador Garcia) allegedly distributed narcotics and collected proceeds from the sales of narcotics, and even accompanied "Chava" on a trip to collect suspected narcotics proceeds. (Bates stamp TIII_TP2_001-00036). Finally, and most importantly, he was trusted to the point he was offered a job with the organization by "Don Pepe", the alleged ringleader. CS-1 related that Don Pepe's offer was that if CS-1 ever wanted a job in the organization s/he should speak to Mendez-Nunez. (Bates stamp TIII_TP2_001-00037). The previously mentioned accomplishments, which would be instrumental to any investigation, were all accomplished without the use of overly-intrusive wiretaps.

Furthermore, the DEA obtained significant information through CS-2. CS-2 met Garcia at Raul's Bar and was able to purchase cocaine from him almost immediately. (Bates Stamp TIII_TP2_001-00039). CS-2 was subsequently able to make multiple controlled purchases of cocaine as detailed in Agent Holbrook's affidavit. (Bates stamp TIII_TP2_001-00039 to 00043).

In using both CS-1 and CS-2 the DEA was able to gather evidence without the overly intrusive wiretap. They were able to gather more information about the conspiracy and its members, as well as what roles those members had in the alleged organization. Moreover, the DEA was able to learn intimate details of the organization through consensually recorded phone calls between the CS's and members of the conspiracy.

C. **The Necessity Requirement was Insufficient on the Face of the October 8, 2007, Affidavit Because the Government Dismissed the Use of Other Normal Investigatory Techniques with Boilerplate Language and Contradicted its Past Investigative Results.**

The "Necessity" portion of the affidavit in the October 9, 2007 affidavit was a near perfect example of cut and pasted boilerplate language when compared to the August 13, 2007 affidavit. (Bates stamps TIII_TP2_001-00051, 52 and TIII_TP3_001-00154, 155). In the more recent affidavit, the name "Mendez-Nunez" is simply substituted for that of "Garcia." By doing so, the agent has completely ignored all the investigatory progress made through normal

investigative techniques. Specifically, each assertion made in the "Necessity" section of the October 9, 2007 contradicts results asserted in the previous affidavits filed by Agent Holbrook. These contradictions prove the necessity alleged by the DEA is for the sake of convenience and ease of investigation, rather than true necessity.

Agent Holbrook claims that physical surveillance, without the use of wiretaps, is unlikely to succeed in fully identifying all co-conspirators and transaction of illegal substances. (Bates stamp TIII_T3_001-00155) In addition to being unsubstantiated boilerplate language, this is untrue as demonstrated by the DEA's own investigation. The DEA was able to have a Confidential Source (CS-1) accompany Garcia on an alleged drug transaction where they were able to record the address of the transaction as well as the identity of others involved. (Bates stamp TIII_TP2_001-00036) The DEA agents were able, through physical observation alone, to observe a suspected drug transaction between Garcia and Jose Burciaga, and a confirmed drug transaction between Garcia and Leticia Lopez. (Bates stamp TIII_TP2_001-00037 to 00039) Furthermore, the DEA was able to video record a suspected drug transaction without the use or benefit of Title III wiretaps. (Discovery CD N-27).

Agent Holbrook also claims that "Surveillance is of limited value, particularly in controlled substance investigations where transactions occur out of public view." (Bates stamp TIII_TP3_001-00155). This is clearly not the case in this investigation as the DEA knew of the alleged locations of drug distribution as well as being able to observe and video tape alleged drug deals.

Agent Holbrook also stated that physical surveillance would likely result in detection of law enforcement and adversely affect the investigation. (Bates stamp 217). This was the exact same claim by Agent Holbrook espoused in the initial application for the wiretap on Target Phone 2. (Bates stamp TIII_TP3_001-00156). However, the claim is wholly unbelievable and without merit because in the three subsequent affidavits there is no indication that law enforcement was ever detected. The investigation continued as it had before and the targets of that investigation were never alerted to the presence or possibility of law enforcement. In is absolutely absurd to claim that the physical surveillance would fail, and still continue with the physical surveillance without ever failing.

The assertions made by Agent Holbrook regarding the Confidential Sources further demonstrates the lack of "Necessity". The most glaring inconsistency and untruth is paragraph

46, indicating why Agent Holbrook believes that necessity exists because CS-1 will be ineffective. (Bates stamp TIII_TP3_001-00158). Months before the affidavit of October 9, 2007, CS-1 was able to penetrate deep into the drug organization. S/he was offered a position of significant responsibility and was able to meet the head of the organization "Don Pepe." The head of the organization is likely the highest value target of investigation for the DEA. Don Pepe will certainly know the major players, who will in turn know those lower on the food chain. The DEA had access to Don Pepe, before the use of any Title III surveillance and inexplicably neglected to pursue this lead. The victims of the unnecessary surveillance, specifically Mr. Mendez Jr. should not pay the consequence of having his privacy intruded upon.

Furthermore, the DEA never attempted any interviews of subjects or associates and has no reliable evidence it would have been ineffective in this case, as they make the conclusory claim of such in paragraph 51 of the October 9, 2007 affidavit. (Bates stamp TIII_TP3_001-00159, 160). The DEA certainly had probable cause to arrest Garcia for quite some time after making controlled buys from him. They knew he was a significant player because, through physical surveillance, they were able to observe him interacting with other high ranking targets of the alleged conspiracy and observe drug deals in which he was involved. However, the DEA again decided to ignore this potential wellspring of information, instead opting for the easier but unnecessarily intrusive method of Title III wiretapping.

When viewed both individually and as a whole, the above allegations of necessity espoused by the DEA were clearly false or, at best, overstated. The specific facts and circumstances of this particular investigation were never directly addressed. Instead, the government attempted to explain away its failure to use these effective and traditional techniques with unsupported generalizations and boilerplate language, making the application insufficient on its face. *See Ashley*, 876 F.2d at 1072.

> D.   **The Previous Title III Wiretaps in Conjunction with the Government's Confidential Sources Provided Overly-Sufficient Evidence, Making the Application For Wiretaps on Target Phone 3 Insufficient for Lack of Necessity.**

When the Government applied for a wiretap of Target Phone 3, they had already garnered more than sufficient evidence from the previous wiretap of Target Phone 2 and use of CS-1 and

CS-2. The controlled buys, recorded conversations and observational investigation, already used or in use made intrusive electronic surveillance unnecessary. By October 9, 2007 the government already had identified several members of the alleged drug conspiracy and was in the position to arrest more conspirators who could then be used as confidential sources. The government had success with this technique and subsequently abandoned it without reason.

Furthermore, the government had made visual identification of the major players, knew the location of possible stash houses and drug distribution points, had success with trash pulls, intercepted numerous pertinent phone calls and had CS's with access to those at the top of the alleged conspiracy. The government had obtained a significant amount of very relevant information before the application for the wiretap was submitted.

If there were any inadequacy of normal investigative procedures that may have existed on August 13, 2007, when the first application for a wiretap on Target Phone 2 was granted, that inadequacy long disappeared by the time the government applied for a wiretap on Target Phone 3 on October 9, 2007. Thus, it was clearly no longer necessary to use wiretaps to accomplish the objectives of the investigation. Wiretapping is not to be used as a first resort investigative tool. *Ashley*, 876 F.2d at 1072. Furthermore, the government is required to "make a reasonable, good faith effort to run the gamut of normal investigative procedures" before wiretapping telephones. *Id*. The DEA did not do that in this case, instead claiming that the normal investigative techniques, which had already been successful, were not sufficient to the point they needed a wiretap.

Because the government had gathered sufficient evidence with its initial wiretap, any other evidence needed to prove its case beyond a reasonable doubt could have been gathered through a variety of normal investigative techniques. The application for the initial wiretap on Target Phone 3 on October 9, 2007 and the subsequent application for an extension on September 11, 2007 were facially insufficient for failure to meet the necessity requirement. Therefore, all evidence gathered from all wiretaps commencing after the October 9, 2007 application must be suppressed.

### E. Government Agents Completely Ignored Statutory and Judicially Ordered Minimization Requirements

There is pervasive evidence in this matter that government agents failed to minimize calls in any meaningful manner. Thus, all Title III evidence should be suppressed.

The minimization requirement means, essentially, that once the monitoring agent has had a reasonable opportunity to assess the nature of an intercepted communication, he or she *must stop* monitoring that communication if it does not appear relevant to the government's investigation. *United States v. Mansoori*, 304 F.3d 635, 646 (7th Cir. 2002) [emphasis added]; *see also United States v. David,* 940 F.2d 722, 730 (1st cir. 1991) (once an agent determines the call is non-pertinent they "must desist" from monitoring).

In determining whether government agents sufficiently followed the statutory minimization requirements, this Court must determine whether the agents' conduct was "objectively reasonable given the circumstances confronting the agents." *Mansoor, supra,* 304 F.3d at 746, *citing Scott v. United States*, 436 U.S. 128, 137 (1978). The factors this Court should consider "include the kind and scope of criminal enterprise that the government was investigating, the thoroughness of the government's efforts to ensure that non-pertinent calls [were] minimized, the extent to which the government could have foreseen that certain types of conversations would be innocuous and thus subject to minimization, use of code, and the extent to which the authorizing judge oversaw the interception efforts." *Id., citing United States v. Quintana,* 508 F.2d 867, 874-75 (7th Cir. 1975); *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000), cert. denied, 531 U.S. 915, 121 S.Ct. 272, 148 L.Ed.2d 192 (2000); *United States v. Bankston*, 182 F.3d 296, 307 (5th Cir. 1999), *judgment rev'd on other grounds by Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. r365, 148 L.Ed.221 (2000); and *United States v. Williams*, 109 F.3d 502, 507 (8th Cir. 1997), *cert. denied*, 522 U.S. 917, 118 S.Ct. 303, 139 L.Ed.2d 234 (1997). It should be noted, however, there is no bright line test for the length of time agents should listen to a call before the monitoring should stop. *Mansoori*, 304 F.3d at 647-648.

Importantly, because the objectively reasonable standard is being used, the question this court must ask is simply whether the government failed to comply with statutory requirement to minimize. *United States v. Homick*, 964 F.2d 899 (9th Cir. 1992). Consequently, whether the government agents had good or bad motives is irrelevant. *United States v. Feldman*, 606 F.2d 673 (6th Cir. 1979).

Here, government agents provided progress reports on their monitoring of Target Phone 3. There are progress reports for days 1-10 (Bates stamp TIII_TP3_001_00191) and days 11-20 (Bates stamp TIII_TP3_001_00277) for the first period of monitoring. Additionally, there are progress reports for these same time periods during the extension of the wiretap. (Bates stamp TII_ TP3_001-00455, 504). Inexplicably, however, there are no reports for days 21-30 during the initial or continued period of monitoring of Target Phone 3. Based on the data provided, the government did not appropriately minimize calls.

During the initial twenty days of the Title III tap on Target Phone 3, 54 calls were recorded and only one was minimized. Thus, the government only minimized a negligible 1.85 % of total calls. Similarly, in days 1-20 of the continued monitoring period for Target Phone 3, there were 167 calls intercepted, only 5 of which were minimized. In this instance the government minimized a mere 2.99% of all calls.

The absurdity of this lack of minimization is compounded when viewed in the light of the overall success rate of all intercepted calls. Of the 221 reported, intercepted calls that were intercepted, only a little better than a quarter of them were deemed pertinent. (61 pertinent calls out of 221 total calls intercepted; 6 of which were minimized).

It is most important to point out, when viewing the factors to be considered, that although there were progress reports, it does not appear there was any serious scrutiny of these reports. It should have been the proverbial red flag that in the first twenty days, 54 calls were intercepted and only one was minimized.

The government expressly averred that it would minimize non-pertinent calls "immediately." The agents on the case were informed of this procedure and even signed forms at the minimization procedures sign-in. (for example, Bates stamp TIII_TP3_001_00375). Clearly everyone involved knew his or her responsibility; tragically very few people involved acknowledged this responsibility and followed the judicially ordered procedure.

It is clear the government minimized only a few calls to give the appearance they were following procedure and the instructions of a federal judge. Instead, they have learned details of the private lives of people for which they had no legitimate business to intrude upon. With such violation of privacy, society in general loses. This overtly wrong and illegal behavior by the government cannot be rewarded.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, Francisco Mendez Jr. respectfully requests that this Honorable Court suppress all evidence illegally obtained from the improper Title III wiretap of Target Phone 3.

                             Respectfully Submitted,

                             /s/ Gal Pissetzky
                             Attorney for Francisco Mendez Jr.
                             Pissetzky & Berliner, P.C.
                             53 W. Jackson Blvd, Ste. 1403
                             Chicago, Il 60604
                             312-566-9900

## CERTIFICATE OF SERVICE

    The undersigned, Gal Pissetzky, hereby certifies that in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, and the General Order on Electronic Case Filing (ECF), the

**FRANCISCO MENDEZ JR'S MOTION TO SUPRESS TITLE III MATERIAL AND MEMORANDUM IN SUPPORT THEREOF**

was served on June 30, 2008, pursuant to the district court's ECF filers to the following:

    J. Gregory Deis
    Assistant United States Attorneys
    219 S. Dearborn St., 5th Floor
    Chicago, IL 60604

    Respectfully submitted,

    /s/ Gal Pissetzky_____
    Gal Pissetzky
    Attorney for Francisco Mendez Jr.
    Pissetzky & Berliner, P.C.
    53 W. Jackson Blvd., Suite 1403
    Chicago, IL 60604
    (312)566-9900