UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 07 CR 851 |
| v. | ) | |
| | ) | Hon. Robert W. Gettleman |
| FRANCISCO MENDEZ-NUNEZ, et al. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT SOTO'S MOTION TO SUPPRESS EVIDENCE**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby responds to defendant Soto's motion to suppress evidence. For the reasons set forth below, defendant's motion should be denied.

**I.    INTRODUCTION**

On December 20, 2007, a search warrant was executed at 2846 West 39th Place, Chicago, Illinois, the residence of defendant Francisco Soto. Agents initially believed that the residence was subdivided into a first floor unit and a basement unit, the latter of which was not occupied by defendant. Accordingly, agents requested and obtained authority to search the following location:

> The premises to be searched is the first-floor apartment, Unit F, of a white-frame house known as 2846 W. 39th Place, Chicago, Illinois. The address has two units in the primary residence (along with a separate coach house, which is not to be searched, located at the rear of the property, with the numbers 2846 displayed on the alley side) . . . The entrance to the first floor unit, Unit F, is a wrought iron white screen door in the front of the residence and located at the top of a set of concrete stairs. (The second unit, which is not to be searched, is in the basement, with the entrance in the back of the building on the west side.)

*See* Search Warrant Application, attached as Exhibit A, and Search Warrant, attached as Exhibit B, for 2846 W. 39th Place, Unit F, Chicago, Illinois. As described below, the primary residence at 2846 W. 39th Place was not divided into two units – Unit F and a basement unit – as contemplated

in the search warrant. Once agents entered the residence to execute the warrant, they discovered that the building was just a single family home with a basement, and was not subdivided into two separate units.

After discovering that the basement was just an extension of defendant's residence, rather than a separate unit, agents searched the basement and recovered the following items: 407.3 grams of cocaine hydrochloride, which was concealed in a black plastic bag in the basement ceiling ("Ceiling Cocaine"), 26.8 grams of cocaine hydrochloride, which was recovered from a shelving unit ("Shelf Cocaine"), two digital scales, three cellular phones, $220 in cash, and miscellaneous papers and documents.

## II. FACTUAL BACKGROUND

The government expects that the following testimony would be given at a hearing on this matter.

### A. The Affidavit in Support of the Search Warrant

DEA Special Agent Matthew Holbrook was the affiant on the search warrant application for defendant's residence. SA Holbrook is expected to testify[1] that he investigated the residence located at 2846 West 39th Place, Chicago, Illinois, and came to believe that there was a separate unit, not utilized by defendant, in the basement of the residence. During SA Holbrook's investigation, he

---

[1] At this time, the government does not believe that a hearing on defendant's motion to suppress is necessary. To obtain an evidentiary hearing on his motion to suppress, defendant was required to "provide sufficient information to enable the court to conclude that a substantial claim [was] presented and that there [were] disputed issues of material fact which [would] affect the outcome of the motion." *United States v. Greve*, 490 F.3d 566, 572 (7th Cir. 2007). The material facts – that items of evidence were recovered from the basement, and that the search warrant excluded the basement from the area to be searched – are not contested by either party. In order to decide the legal impact of those material facts, this Court does not need to hear evidence or to make a credibility determination, and as such, no hearing is required. *Id.*

obtained records from ComEd. SA Holbrook is expected to testify that those records indicated defendant was receiving power service at the following address: 2846 W. 39th Place, Unit F. The "Unit F" designation led SA Holbrook to believe that the residence located at 2846 W. 39th Place was subdivided into more than one unit. SA Holbrook further would testify that the exterior appearance of the residence at 2846 W. 39th Place suggested the possible presence of a separate unit in the basement level. In addition, SA Holbrook and other agents had only surveilled defendant using the front door, while the basement level appeared to have a separate door located at the rear of the residence. SA Holbrook would testify that he concluded, based on all of the above information and in an abundance of caution, that defendant lived on the first floor or "Unit F" of the residence at 2846 W. 39th Place, and that there was a separate unit in the basement level at that address. Accordingly, in an effort to protect the privacy of the presumed tenant of the basement level, SA Holbrook excluded what he believed was a separate basement unit from his request for a search warrant of 2846 W. 39th Place[2].

SA Holbrook's affidavit further outlined evidence that defendant used his residence for drug trafficking. Specifically, SA Holbrook explained that co-defendant Salvador Garcia traveled to defendant's residence on more than one occasion to pick up cocaine from defendant. *See* Search Warrant Affidavit, at ¶¶39, 41-43, 111. On September 18, 2007, co-defendant Salvador Garcia was surveilled as he visited defendant's residence, following calls intercepted over Target Phone 2, during which Salvador Garcia ordered cocaine. *Id.* at ¶37-39. Shortly after Salvador Garcia left defendant's residence, officers conducted a traffic stop on him, and recovered 35.5 grams cocaine

---

[2] SA Holbrook did not participate in the December 20, 2007 arrest of defendant or the search of defendant's residence.

hydrochloride from Garcia's pants pocket. *Id.* In addition, calls intercepted over Target Phone 2 suggested that Salvador Garcia traveled to defendant's residence to pick up cocaine on September 20, 24, and 29, 2007. *Id.* at ¶¶41-43. Moreover, during a call intercepted over Target Phone 3 on October 31, 2007, co-defendant Francisco Mendez-Nunez told co-defendant Javier Garcia that he would go to defendant Soto's residence to purchase drugs if Javier Garcia was not available. *Id.* at ¶49.

SA Holbrook further would testify that DEA commonly requires the assistance of state and local police agencies to complete multi-defendant takedowns, especially where search warrants are to be executed. In this case, nine defendants were arrested and several search warrants were executed. As a result, SA Holbrook would testify that he enlisted the assistance of several other law enforcement agencies, whose agents had no prior knowledge of this investigation, to complete the takedown.

### B.     The December 20, 2007 Arrest of Defendant and Search of his Residence

DEA Special Agent Dick Mah is expected to testify that he was the DEA Team Leader for the search warrant executed at defendant's residence on December 20, 2007. SA Mah would testify that DEA commonly requires the assistance of state and local police agencies to complete multi-defendant takedowns, especially where search warrants are to be executed. In such cases, DEA assigns a DEA Special Agent to act as Team Leader for each location where a search warrant or arrest warrant is to be executed. The DEA Team Leader is then responsible for doing the reporting and other paperwork related to the event, and for collecting any evidence.

SA Mah further would testify that he attended a takedown planning meeting on December 19, 2007 that was led by SA Holbrook. The takedown meeting was attended by all or most of the

team leaders assigned to the takedown in this case and by some, but not all of the federal and local law enforcement officers assigned to each team. At the meeting, agents discussed a general overview of the case, along with issues relating to each individual team. At the time of the takedown meeting, the search warrant for defendant's residence had not yet been signed by a judge. SA Holbrook distributed the search warrant to SA Mah at some point after the meeting.

SA Mah further would testify that he assembled with his team early in the morning of December 20, 2007 to plan for defendant's arrest and the search of his residence. SA Mah's team included agents from various federal agencies, as well as officers from the Chicago Police Department. SA Mah would testify that one copy of the search warrant was distributed amongst the team and that all team members were expected to have read the warrant.

SA Mah would testify that his team knocked at defendant's residence and announced their presence. After waiting approximately one minute, the team gained entry to the residence, and observed two adults coming from the kitchen area in the back of the house. The two adults were later identified as defendant and his wife. Defendant was placed into custody and his wife was temporarily detained. Agents then conducted a protective sweep of the residence, including the basement. SA Mah would testify that the kitchen was located in the rear of the house. The kitchen contained a doorway leading to a set of stairs down to the basement. SA Mah does not recall whether the doorway to the basement actually included a door, but does recall that the doorway was open; in other words, if there was a separate door to the basement, it was open at the time of the protective sweep. SA Mah would testify that he conducted a protective sweep of the basement[3].

---

[3] SA Mah did not observe the Ceiling Cocaine or the Shelf Cocaine during the protective sweep.

SA Mah would testify that the basement appeared to be part of defendant's residence, and that there was no evidence that the basement was a separate unit, as contemplated in the search warrant.

SA Mah would testify that, after defendant was arrested, he was informed by one of the search team members that another team member had questioned defendant, likely before he was advised of his Miranda rights. SA Mah does not recall the name of the team member who he was told questioned defendant or the particular question(s) he was told were posed. SA Mah would testify that he learned from another team member that, in response to the question(s) posed, defendant stated that there was a firearm located in the front porch, and that there was cocaine located in the basement ceiling[4]. After the defendant was questioned and the protective sweep was completed, agents searched the residence, including the basement.

IRS Special Agent Michael Thalji is expected to testify that he assisted in executing the search warrant at Soto's residence on December 20, 2007. SA Thalji would testify that he took digital photographs of Soto's home and of certain evidence recovered from the residence. SA Thalji would testify that, as items of interest were found throughout the house, he attempted to photograph the items in place. In some instances, he followed up with additional photos of the items after they were recovered from their original resting place.

---

[4] The government has interviewed several of the agents and officers who were part of SA Mah's team on the day of defendant's arrest. Although many of the agents recalled being told at some point about the substance of defendant's statements, the government has not been able to identify the particular agent who questioned defendant, or the particular question posed. Accordingly, at this time, the government is not seeking to admit defendant's statements about the location of the firearm or the cocaine in the basement ceiling pursuant to the public safety exception outlined in *New York v. Quarles*, 467 U.S. 649 (1984) and *United States v. Edwards*, 885 F.2d 377 (7th Cir. 1989). However, the government has not yet interviewed every member of SA Mah's team, and reserves the right to seek admission of defendant's statements if the proper foundation can be laid.

With respect to the Ceiling Cocaine, SA Thalji first photographed the black plastic bag of cocaine in the place where it was found, in the basement ceiling rafters. SA Thalji would testify that the Ceiling Cocaine was recovered from a section of the basement that appeared unfinished – the basement ceiling rafters in that area were exposed, and were not covered with drywall or any similar material. The bag containing the Ceiling Cocaine then was removed from the rafters, and photographed by SA Thalji. In addition, SA Thalji took a detail photo of the Ceiling Cocaine after it was removed from the bag. With respect to the Shelf Cocaine and two digital scales, SA Thalji first photographed those items in the place where they were found, in a shelving unit in the basement. SA Thalji then took additional detail photographs of those items. Similarly, SA Thalji photographed a Nokia cellular phone and a Kyocera cellular phone in the place where they were found, on a dresser in the basement. SA Thalji also photographed a Motorola cellular phone in the place where it was found, in the basement living room.

Finally, SA Thalji would testify that he found approximately $40 in $1 denominations in the basement ceiling, and approximately $180 in $20 denominations in the basement living room. SA Thalji would testify that he counted the $220 in front of defendant's wife, and returned the money to her.

FBI Special Agent Eric McIntosh also assisted in executing the search warrant at Soto's residence on December 20, 2007. SA McIntosh is expected to testify that he recovered the Ceiling Cocaine and Shelf Cocaine, two digital scales, the Nokia and Kyocera cellular phones, and miscellaneous papers and documents found in a basement dresser. SA McIntosh would testify that he turned all of the aforementioned evidence over to SA Mah. SA Thalji would testify that he recovered the Motorola cell phone and turned it over to SA Mah. SA Mah would testify that he

7

transported all of the recovered evidence to the Chicago Police Department's Homan Square facility, where he turned it over to DEA Special Agents James Walsh and John Kennelly for processing.

SA Mah, SA Thalji, and SA McIntosh all would testify that it was their general practice to review search warrants before executing them. However, because SA Mah's team was merely assisting SA Holbrook with the takedown, and was not otherwise familiar with the investigation, none of the agents have a specific memory of the content of this particular warrant. All three agents would testify that, during the search of the residence, none of the search team members discussed the warrant's exclusion of the basement from the search.

### III.  LEGAL ARGUMENT

#### A.  Introduction

Defendant's motion to suppress raises two legal arguments: (1) probable cause to search one unit in a multi-unit building does not support a warrant authorizing a search of the entire building; thus, the warrant authorizing a search of the "first floor apartment" could not have authorized the search of the basement; and (2) the agents improperly searched the basement after learning information (namely, that the basement was not a separate unit as contemplated in the search warrant) about the residence that was never disclosed to the to the magistrate who issued the warrant. Defendant's first argument relies on what is often called the *Hinton* rule, and fails to acknowledge a significant exception to the *Hinton* rule, which provides that the rule does not apply where there is evidence that the defendant had access to or used the entire structure. Defendant's second argument relies upon cases that are factually distinguishable from the instant case. More importantly, however, the evidence recovered from defendant's basement is admissible under the inevitable discovery doctrine.

**B.    The Evidence Recovered from Defendant's Basement is Admissible Under the Inevitable Discovery Doctrine.**

The inevitable discovery doctrine was first adopted by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 444 (1984) (holding that murder victim's body discovered pursuant to illegal search was admissible where evidence showed that search party would have discovered the body in the absence of police misconduct). In *Nix*, the Supreme Court held, "If the prosecution can establish by a preponderance of the evidence that the [illegally obtained] information ultimately or inevitably would have been discovered by lawful means . . . [then that] evidence should be received." The Supreme Court explained that inevitable discovery doctrine is similar to the independent source doctrine[5], which "teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Id.* at 443. The inevitable discovery doctrine reflects a similar balancing of interests. *Id.* at 444. Excluding evidence that the police inevitably would have obtained if no misconduct had taken place would place the government in a worse position than if the misconduct had never occurred. *Id.* In keeping with this balancing, the inevitable discovery doctrine does not require the government to prove that the illegally obtained evidence had been recovered by officers acting in good faith:

> The requirement that the prosecution must prove the absence of bad faith . . . would place courts in the position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity. Of course, that view would put the police in a worse position that they would have been

---

[5] The independent source doctrine provides for the admission of illegally obtained evidence that was "purged of the primary taint" or discovered by means independent of the initial constitutional violation. *Id.* at 442-43 (citation omitted).

in if no unlawful conduct had transpired. And, of equal importance, it wholly fails to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice. Nothing in this Court's prior holdings supports any such formalistic, pointless, and punitive approach.

*Id.* at 445.

In *United States v. Tejada*, 524 F.3d 809 (7th Cir, 2008), the Seventh Circuit relied upon the inevitable discovery doctrine to affirm the admissibility of cocaine that had been recovered without a search warrant. In *Tejada*, defendant met with an undercover agent posing as a cocaine buyer. *Id.* at 810. Defendant showed the agent a blue travel bag containing the cocaine, but then told the agent that he would have to go to defendant's nearby apartment to complete the deal. *Id.* Defendant returned to his apartment, and shortly thereafter, agents arrested him there. *Id.* at 811. Next, agents conducted a protective sweep of the apartment. *Id.* During the sweep, agents opened a closed cabinet in defendant's entertainment center. *Id.* In the cabinet was the blue travel bag that defendant had shown to the undercover agent. *Id.* Agents opened the travel bag, and found another bag, which they opened, and then found cocaine. *Id.*

The Seventh Circuit held that the cocaine was admissible under the inevitable discovery doctrine[6]. The court recognized authority from other circuits suggesting that "the doctrine should be confined to the situation in which the police are gathering evidence with a view toward obtaining a search warrant, and it is certain or nearly so that, had one of them not jumped the gun and searched without a warrant, the investigation would have culminated in a successful warrant application." *Id.* at 812-13 (citing cases). The court further recognized a contrary view that would apply the

---

[6] The Seventh Circuit also held that the cocaine alternatively was admissible under the line of cases that permit the search of an area under defendant's control at the time of his arrest, even if the area is no longer under his control at the time of the search. *Id.* at 812 (citing cases).

inevitable discovery doctrine "in any case in which the police have probable cause to obtain a warrant." *Id.* at 813.

> The Seventh Circuit rejected both views in favor of an intermediate position:
>
> An attractive middle ground is to require the government, if it wants to use the doctrine of inevitable discovery to excuse its failure to have obtained a search warrant, to prove that a warrant would certainly, and not merely probably, have been issued had it been applied for. This was the approach taken in *United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990), and explained in *United States v. Elder*, 466 F.3d 1090, 1091 (7th Cir. 2006): "when a warrant is *sure* to issue (if sought), the exclusionary 'remedy' is not a remedy, for no legitimate privacy interest has been invaded without good justification, but is instead a substantial punishment of the general public" (emphasis added). A requirement of sureness – of some approach to certainty – preserves the incentive of police to seek warrants where warrants are required without punishing harmless mistakes excessively. For we must bear in mind that the people who are punished when criminals escape justice are not the police; they are the people on whom criminals prey.

*Id.* Applying this intermediate test, the court found that inevitable discovery had been shown, despite the fact that the agents "never had plans to obtain a search warrant." *Id.* The court noted that the police were lawfully in the apartment, and were lawfully entitled to open the cabinet in the entertainment center, where they found in plain view the blue travel bag, which they knew contained cocaine. *Id.* There was no doubt that, under such circumstances, had the agents applied for a warrant to search the bag, the warrant would have been issued. *Id.*

Similarly, in this case there is no question that the initial entry into defendant's basement, to conduct a protective sweep, was lawful. *Maryland v. Buie*, 494 U.S. 325 (1990) (holding protective sweep of adjacent rooms is reasonable when officers enter a house to make a search or arrest). Upon lawfully entering the basement, it became clear that the basement was just a part of defendant's residence, and not a separate, independent unit. Had the agents applied for a warrant to search the basement (again, a part of defendant's residence), there is no question that the warrant

would have been issued, given that a warrant *already* had been issued for the remainder of defendant's residence.

### C. The Evidence Recovered from Defendant's Basement is Admissible Under the Exception to the *Hinton* Rule.

Defendant argues that the evidence recovered from his basement should be excluded under what is commonly known as the *Hinton* rule. *See* Motion at 2-3 (citing *United States v. Hinton*, 219 F.2d 324 (7th Cir. 1955)). Under this rule, "probable cause to search one apartment building in a multi-unit building does not support a warrant authorizing a search of the entire building." *Id.* at 3 (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)). Accordingly, defendant agues that the search of the basement exceeded the warrant, which was limited only to the "first floor apartment." However, defendant's motion completely ignores a significant exception to the *Hinton* rule, explained in the very case defendant cited: "The only exceptions to [the *Hinton*] rule are when (1) the officer knows there are multiple units and believes there is probable cause to search each unit, or (2) the targets of the investigation have access to the entire structure." *Jacob*s, 215 F.3d at 767 (citations omitted). Given that defendant clearly had access to his own basement, the evidence recovered from that location cannot be excluded under the *Hinton* rule.

This exception to the *Hinton* rule was explained in *United States v. Butler*, 71 F.3d 243 (7th Cir. 1995). In *Butler*, defendant moved to suppress evidence found in the first floor apartment of a three-flat building. *Id.* at 248. Defendant argued that probable cause had to be separately established for each unit, and that the search warrant affidavit established probable cause only for the second floor apartment. *Id.* The Seventh Circuit acknowledged that the *Hinton* rule generally required a probable cause determination for each individual unit in a multi-unit building. *Id.* at 249. However, the court also recognized an exception to the rule where, "although appearing to be a

12

building of several apartments, the entire building is actually being used as a single unit." *Id.* (quoting *Hinton*, 219 F.2d at 326). In that case, "a finding of probable cause as to a portion of the premises is sufficient to support a search of the entire structure." *Id.* The Seventh Circuit has applied this exception "in cases where the target of the investigation or warrant exercised dominion and control over the entire building or had access to the entire structure." *Id.* (citations omitted).

In this case, defendant's residence appeared to be a multi-unit building, but was in fact a single family residence. Information gathered during the protective sweep of defendant's residence indicated that the entrance to the basement was located in his kitchen, and there was no evidence that defendant's access to the basement was restricted in any way. There is no doubt that defendant had access to the entire structure. Indeed, this is arguably a stronger case for admission of the evidence than *Butler* and other cases applying the exception to the *Hinton* rule to multi-unit buildings. In this case, the subject of the search was actually a single family residence, so there is even less doubt as to defendant's control over the entire structure. Accordingly, the evidence recovered from defendant's basement is admissible under the exception to the *Hinton* rule.

> **D.   The Evidence Recovered from Defendant's Basement Should Be Admitted Because the Agents Did Not Discover the Search Warrant's Error Until After They Began the Search.**

Defendant further argues that the evidence recovered from his basement should be excluded because the agents who searched the basement relied on information never disclosed to the magistrate; namely, that the basement was a part of defendant's residence and not a separate unit. However, the cases cited by defendant are distinguishable, in that they turn on the knowledge an agent possessed *before* the search warrant was executed. In this case, the agents did not develop the

pertinent knowledge until *after* they actually entered defendant's residence and began the process of executing the warrant.

Defendant relies on *Jones v. Wilhelm*, 425 F.3d 455 (7th Cir. 2005) and *United States v. Fahey*, 2008 WL 239152 (N.D. Ill. Jan. 29, 2008) for the proposition that an agent who discovers a search warrant's ambiguity or error before execution may not rely on information that was not disclosed to the magistrate in exercising his discretion to resolve the ambiguity or error. Motion at 4-5. In both *Jones* and *Fahey*, the officers were well aware of an ambiguity or error in the search warrant *prior* to its execution. *Jones*, 425 F.3d at 459; *Fahey*, 2008 WL 239152 at *2. In both cases, the officers relied upon knowledge they had gained over the course of the investigation, knowledge that had not been disclosed to the magistrate in the search warrant affidavit, to resolve the error and to determine the proper residence to be searched. *Id.*

*Jones* and *Fahey* are wholly distinguishable from the instant case. In this case, the agents had no prior knowledge of any ambiguity in the warrant. It was not until the agents gained entry to defendant's residence, arrested defendant, and completed a protective sweep of the residence, that they realized that the basement simply was part of the residence, not a separate unit.

Accordingly, this case is more analogous to *Maryland v. Garrison*, 480 U.S. 79 (1987) than to *Jones* or *Fahey*. In *Garrison*, officers obtained a warrant to search what they believed was the only apartment located on the third floor of a building. *Id.* at 81. When the officers executed the warrant, they searched throughout the third floor. *Id.* Well into the search, the officers realized that the third floor was actually divided into two separate apartments, one belonging to the intended target of the search warrant, and one belonging to Garrison. *Id.* By the time officers discovered

14

their mistake and discontinued their search, they had already recovered heroin, cash, and drug paraphernalia from Garrison's apartment. *Id.*

The Supreme Court recognized "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making process and executing search warrants." *Id.* at 87. The Court held that the evidence recovered from Garrison's apartment was admissible: "Prior to the officers' discovery of the factual mistake, they perceived [the intended target's] apartment and [Garrison's apartment] as one and the same; therefore their execution of the warrant reasonably included the entire third floor . . . [T]he officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Id.* at 88.

Similarly, the agents who searched defendant's basement did not know until *after* they entered the building that the basement was a part of defendant's residence. Given that the search warrant granted them authority to search defendant's residence, they reasonably searched the basement once they discovered that the basement was, in fact, a part of the residence. This is precisely the kind of mistake that was granted latitude by the Supreme Court in *Garrison* and by the Seventh Circuit. In *United States v. Stefonek*, 179 F.3d 1030, 1032 (7th Cir. 1999), defendant claimed that the search of her businesses exceeded the scope of the application and warrant. The warrant for her businesses listed only Suites 101, 102, and 103, and most of the evidence defendant sought to suppress was recovered from adjacent Suite 104. However, the Seventh Circuit dismissed this argument, holding that "the match was close enough to satisfy the Fourth Amendment, especially since the door to the businesses' office said 'Suite 101' and the division of the interior into separately numbered suites was obscure." *Id.* In this case, there can be no doubt that the

15

warrant intended to apply generally to defendant's residence. The exclusion of the basement from the search warrant was premised on the erroneous belief that the basement contained a wholly separate residence that was not utilized by defendant. The defendant was fully aware that his residence included a basement, and the agents' search did not exceed the scope of what could be classified as "defendant's residence." This, too, is a suitable match for purposes of the Fourth Amendment.

### IV.    CONCLUSION

"The exclusionary rule is a sanction that is supposed to be proportioned to the wrongdoing that it punishes; the rule should not be used to make the person whose rights have been violated better off than he would be if no violation had occurred." *Brown*, 328 F.3d at 357. In this case, exclusion of the evidence from defendant's basement would result in an unfair windfall to defendant. For the foregoing reasons, the government respectfully requests that defendant's motion to suppress be denied.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

Dated: August 29, 2008         By:   s/Meghan C. Morrissey
                                     MEGHAN C. MORRISSEY
                                     J. GREGORY DEIS
                                     Assistant United States Attorneys
                                     219 South Dearborn Street, Room 500
                                     Chicago, Illinois 60604
                                     (312) 353-4045

**CERTIFICATE OF SERVICE**

      The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

**GOVERNMENT'S REPSONSE TO DEFENDANT SOTO'S MOTION TO SUPPRESS EVIDENCE**

was served pursuant to the district court's ECF system as to all ECF filers, on August 29, 2008:

                                                s/Meghan C. Morrissey
                                                MEGHAN C. MORRISSEY
                                                Assistant United States Attorney
                                                219 South Dearborn Street, Room 500
                                                Chicago, Illinois 60604
                                                (312) 353-4045